CHARLES V. RUTLEDGE and WILLIAM TAYLOR, doing business under the name DAIRICREAM CO., Plaintiffs and Appellees, *v.* JAMES B. GILL, Defendant and Appellant.

No. 11465.   Argued April 11, 1955.—Decided September 27, 1955.

*Abelardo Ruiz Suria* for appellant. *James R. Beverley* and *Francisco Castro Amy* for appellees.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

At the beginning of 1951, Charles V. Rutledge, a resident of Texas, and William Taylor formed a partnership under the name "Dairicream Co." for the purpose of operating an ice cream business in Puerto Rico for the sale of ice cream mix, as well as the necessary machinery for preparing the ice cream for sale to the consumer, and the establishment of stores throughout the Island in association with other persons. Rutledge had a contract with the Rochester Dairy Cooperative of the State of Minnesota, by virtue of which the cooperative agreed to prepare, for Rutledge's exclusive use, the ice cream mix under the name of "Dairicream."

In one of his visits to Puerto Rico, Rutledge met James B. Gill and agreed to form a partnership with him in the operation of the first "Dairicream" store established in this Island. After several negotiations in which William Taylor took an active part, they leased a lot at 1959 Ponce de León Avenue, Stop 27, Santurce, P. R. for a 5-year term, and obtained a permit of the Planning Board of Puerto Rico to build thereon a store for the sale of ice cream, on condition that it be removed at the expiration of the 5-year term. In August 1951, Rutledge and Gill executed a partnership agree-

ment for the operation of such store by virtue of which Gill agreed to manage the business under certain conditions which we need not mention now. Because of personal differences between Gill and Taylor, Rutledge agreed with Gill to dissolve the partnership existing between them. It was dissolved on November 29, 1951, by virtue of a document entitled "Dissolution of Partnership Agreement." One of the considerations for the dissolution of the partnership was the execution of a contract between the parties to sell to Gill the "Dairicream" store located at 1959 Ponce de León Avenue, Santurce, Puerto Rico.

On that same date, Rutledge and Gill executed a contract drafted in English entitled "Purchase Agreement and Agreement for Operation of Business," in which Rutledge and Taylor were also parties doing business under the name of "Dairicream Co." By virtue of this contract Rutledge sold and transferred to Gill his title, right and interest in the "Dairicream" establishment located at 1959 Ponce de León Avenue, Stop 27, Martín Peña, Santurce, P. R. for the price of $9,660.70, which was equal to Rutledge's investment in that establishment. In that same contract Gill agreed with Rutledge and Taylor, the latter doing business under the name of "Dairicream Co.", to continue operating the aforesaid establishment as a "Dairicream" store with the right to use such trade mark under the following terms and conditions: [1]

---

[1] The original text of these terms and conditions is as follows:

"C—It is now further agreed between James Gill and C. V. Rutledge and William Taylor, doing business as 'Dairicream Co.', that James B. Gill will continue to operate said business as a 'Dairicream' store, with the right to the use of such trade name and mark, under the following terms and conditions:—1—James B. Gill will have the exclusive right to operate as a 'Dairicream' store within the area of 'Martín Peña', Santurce, San Juan, Puerto Rico.—2—James B. Gill will only use in said 'Dairicream' store mix purchased through C. V. Rutledge and William Taylor doing business as 'Dairicream Co.' or their assigns at a price which·shall be no more than twelve cents per pound ($0.12) added to the total cost of said mix to 'Dairicream Co.' deposited at San Juan

(*a*) Gill would have the exclusive right to operate a "Dairicream" store within the area of Martín Peña, Santurce, Puerto Rico.

(*b*) Gill would only use in that "Dairicream" store mix purchased through Charles V. Rutledge and William Taylor or their assignees, at a price which would not be more than 12 cents per pound added to the total cost of the product deposited at San Juan docks.

(*c*) Gill would at all times keep and maintain the store, fixtures and equipment under the highest standards of hygiene and sanitation, in compliance with all laws, rules and regulations promulgated by federal, insular or municipal authorities, and Rutledge and Taylor would have the right to inspect the store at business hours for the purposes of the agreement in this clause.

(*d*) This agreement would last for a term of five years.

By virtue of this contract Gill continued operating the "Dairicream" store in Martín Peña.

In May 1952, Charles V. Rutledge and William Taylor, doing business under the name of "Dairicream Co.," filed the present suit against James B. Gill claiming damages for breach of contract. In their complaint they alleged that approximately since March 1952, Gill "has refused to buy and use and to continue buying and using plaintiff's aforesaid product ["Dairicream" mix] and has discontinued operating

docks.—3—James B. Gill will at all times keep and maintain the 'Dairicream' store, fixtures and equipment under the highest standards of hygiene and sanitation, with the compliance to all laws, rules and regulations promulgated by federal, insular or municipal authorities, and 'Dairicream Co.' its assigns, and their agents or employees, will have the right to inspect the premises and store at suitable business hours for the purposes of looking over its sanitary conditions and *to show them to prospective 'Dairicream' store operators in other areas.*—4—This agreement will last for a term of five (5) years from the date hereof. 5—The convenants herein contained shall bind, and the benefits and advantages shall insure to, the respective heirs, executors, administrators, successors or authorized assigns of the parties hereto. Whenever used, the singular shall include the plural, the plural the singular, and the use of any general (sic) shall be applicable to all genders.—"

the aforesaid business [Martín Peña store] under the name of 'Dairicream', it being at present operated under the name of 'Tastycream' and buying ice cream mix from other persons." They further alleged that they have been willing and ready to sell to the defendant all the ice cream mix which he would need and require for the operation of his business and that the defendant has been buying from other persons, and using in his business a minimum average of 715 pounds per week of ice cream mix. They finally estimated that they have suffered damages in the sum of $22,300 because of the nonperformance by defendant of his obligation to purchase the ice cream mix from them only, and in $10,000 for no longer operating his business under the name and trade mark "Dairicream."

Defendant answered admitting the fact of the execution of the Contract entitled "Purchase Agreement and Agreement for Operation of Business" and admitting that since March 1952, he had not purchased or used plaintiffs' product in his establishment and that he stopped operating said business under the name "Dairicream" and that he operates it at present under the name "Tastycream" and buys the ice cream mix from other persons. As a defense he alleged that if there has been a nonperformance or breach of the aforesaid contract it has been on the part of the plaintiffs and not of the defendant.

Several months later the defendant filed a counter claim alleging that in January or February, 1952, the plaintiffs stopped supplying him with ice cream mix without any reason, whereby he was compelled to rescind the contract between them and to buy ice cream mix in the local market at a higher price. He claimed as damages the excess in price which he paid in the local market and general damages suffered by his establishment.

After a trial on the merits the court rendered judgment dismissing the counterclaim and sustaining the complaint,

ordering the defendant to pay to the plaintiffs the sum of $13,338 as damages, plus costs and $375 for attorney's fees. In rendering this judgment the trial court made, among others, the following findings of fact:

"13—At the beginning of December 1951, while he was visiting in the States, Gill telephoned Rutledge that he needed ice cream mix.

"On December 14, 1951, Rutledge informed Gill in writing that he had sent an order to the Rochester Dairy Cooperative for two shipments of ice cream mix, one for 2,500 pounds and another for 3,750 pounds.

"The parties had agreed that Gill would pay for the first shipment, of 2,500 pounds, of the product on the date of its arrival in Puerto Rico, but that any other shipment would be paid for by Gill when he ordered it and that he would send his check on or about January 1, 1952, to the order of Rutledge as payment for the second shipment of 3,750 pounds of the product which Rutledge had already ordered from the Rochester Dairy Cooperative.

"On January 8, 1952, Taylor gave notice of the arrival of the first shipment of 2,500 pounds of the product to Mr. Eduardo Acosta, Manager of Gill's business, with a copy of the corresponding bill of lading and other documents, and he asked that the merchandise be paid for and removed from the dock. The next day Gill paid the amount of said shipment and removed the merchandise from the dock.

"14—Because of a strike in the United States docks, it was not until February 19, 1952, that the second order of approximately 2,900 pounds of the product was shipped. It arrived in Puerto Rico on the 28th of that same month.

"15—On February 26, 1952, Mr. Abelardo Ruiz Suria, Gill's attorney, wrote a letter to Rutledge complaining of the difficulties in obtaining from them a supply of ice cream mix on time, and suggested the rescission of the contract of November 29, 1951. Rutledge answered said letter informing Mr. Ruiz Suria that for some time now Gill had not answered the letters he had sent him; that Gill had sent him no money to buy the mix and that for said reason he had not placed orders for him. He further stated that a shipment of 58 boxes of the product was on the way, and he finally rejected the rescission of the contract proposed by him.

"On February 29, 1952, the day after the second shipment of the product arrived, and again on March 4, 1952, Taylor informed Mr. Ruiz Suria in writing that they were eager and willing to serve Gill and that they had a reasonable amount of the mix in stock, but that in order to supply the product on time Gill had to give them an estimate of his needs so that they could place the necessary orders with the producer.

"16—Mr. Ruiz Suria informed Gill of the letters addressed to him by Rutledge and Taylor. At no time, before or after, did he send money to pay for the second shipment of the product, nor did he inquire by telephone, personally or through one of his employees or agents as to said shipment.

"17—On March 7, 1952, Gill wrote to Rutledge informing him that he had learned for the first time, through his attorney and from letters which the latter had recently received from Taylor, that a shipment of ice cream mix had arrived in Puerto Rico without his being notified; and that consequently, he considered the contract of November 29, 1951, ended and that he had discontinued using the name and trade mark "Dairicream", in his establishment.

"18—As stipulated by the parties in open court, the defendant Gill has been purchasing for his business a monthly average of 115 boxes of ice cream mix each containing 25.5 pounds of the product, from November 29, 1951, until the present time.

"19—The ice cream mix bought from plaintiffs pursuant to the provisions of the contract of November 29, 1951, and, as the parties understood it, cost defendant 12 cents per pound over the cost of the product to plaintiffs, deposited at the San Juan docks, which resulted in a total cost of 49 cents per pound. Defendant alleges having paid an average price of approximately 57 cents for the product which he has been buying from other persons, that is, 8 cents per pound above what it would have cost him, had he continued buying from the plaintiffs. However, at the time of the hearing of this case the defendant Gill was engaged in the sale and distribution of ice cream mix and other similar business in open competition with the plaintiffs and indefectibly for the purpose of having the benefit of a lower price for the ice cream mix which he had to use in his own business. These acts of the defendant subsequent to his breach of the contract, in becoming a distributor of another or other ice cream mixes for sale in Puerto Rico, is an evi-

dentiary circumstance of great help in settling the controversy in this case."

The defendant cross-claimant appealed and in his brief he assigns the commission of eight errors.

The trial court held that under the contract entitled "Purchase Agreement and Agreement for Operation of Business," to which we shall hereinafter refer as "the Contract," the defendant Gill was bound to continue operating his business under the name of "Dairicream" for the term of 5 years and to buy only from plaintiffs the ice cream mix which he would need for the business during said term. The first error assigned by the appellant attacks this conclusion, which in his opinion involves an erroneous interpretation of the Contract. To this effect he states in his brief: "Erroneously, the lower court imposed an obligation on this defendant by such interpretation of the contract, when it was actually a franchise. The contract clearly grants the defendant the right to continue operating his business under the name "Dairicream", subject, while he so operates it, to the conditions set forth in connection with said franchise but unquestionably it did not impose on him the obligation to operate it under said name for any term whatsoever."

We disagree. For the purpose of interpreting the "Contract" we must not, as appellant does, consider its parts and clauses isolatedly as though it involved two independent transactions. In order to judge the intention of the contracting parties, we must pay attention principally to their acts, contemporaneous and subsequent to the contract and if any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect. Furthermore, the stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together. Sections 1234,

1236 and 1237 of the Civil Code (1930 ed.). *Caballero* v. *Kogan*, 73 P.R.R. 617. We agree with the following reasoning of the trial court:

"On the face of the contract it appears, in the first place, that the plaintiffs granted the defendant the exclusive right to operate a "Dairicream" store within the area of Martín Peña; that is, that the plaintiffs could not establish or grant to any other person the use of their Dairicream mix in the area of Martín Peña, where the plaintiffs had given defendant the exclusive right.

"It further appears from the evidence that the business which the defendant acquired as exclusive owner by virtue of said contract and which was already flourishing and in operation, was sold to him by the co-plaintiff Rutledge at its mere cost. And it must be concluded that said business was sold to the defendant at cost in consideration of the obligations which the defendant reciprocally assumed in said contract such as to buy their Dairicream mix from plaintiffs only.

"Another consideration of the defendant's obligations under the contract was the contemporaneous dissolution of the partnership existing between the plaintiff Rutledge and the defendant as is clearly stated in the agreement of dissolution of the partnership which was Exhibit I of the defendant, and furthermore, although the contract does not expressly say so, it is necessarily inferred from the contract and from the acts of the parties that the plaintiffs bound themselves to sell to the defendant the ice cream mix which he would need for his business during the term of the contract as well as that the defendant was correlatively bound to purchase it, since the latter is inseparable from and inconceivable without the former."

Appellant argues that in view of the fact that the parties knew that the lease contract of the lot where the business (Dairicream store) was located had been canceled, that it was replaced by a month to month verbal contract as well as that said lot was included in the Government's project for the construction of an avenue some time in the future, it would be illogical to interpret that it was the intention of the parties that said appellant should bind himself to operate the business for a specific term of 5 years under the

name of "Dairicream", without having inserted in the contract the corresponding clauses in order to relieve him of said obligation in case the owners of the lot required him to vacate it or the Government should proceed to expropiate the place for the proposed avenue.

The appellant forgets, however, that he was given the exclusive right to operate a Dairicream store in the whole area of Martín Peña, and that he was not limited, therefore, to the premises or lot leased.

The fixing of a 5-year term for the duration of a contract like the one here, and which imposes mutual obligations on the parties, on Gill to purchase and on Rutledge and Taylor to sell "Dairicream" mix, militates strongly against appellant's contention that he could rescind the contract at his will prior to its expiration merely by not using the name "Dairicream". See § 1080 of the Civil Code (1930 ed.)[2] Cf. Arecibo Motor Co. v. Caribe Motors Corp. 60 P.R.R. 391. Consequently, we conclude that the first error was not committed.

▮ Appellant sets forth errors 2, 3, and 8 as follows:

"2)—*The lower court committed manifest error in concluding, on the basis of the evidence introduced in the case, that (a) this defendant repudiated his contract with the plaintiffs and, in so doing, broke his promise without any reason and (b) that the plaintiffs were willing and eager to supply defendant with the product. (J. R., p. 67.)*

"3)—*The lower court committed manifest error in weighing the evidence in this case by concluding that the plaintiffs were willing in turn to carry out their contract with this defendant, as well as in concluding that there was no breach of the contract on part of the plaintiffs prior to its rescission by this defendant. (J. R., pp. 68–71.)*

---

[2] Said section provides:

"Section 1080.—Period presumed as established for benefit of creditor and debtor.—Whenever a period should be fixed in obligations, it is presumed as established for the benefit of the creditor as well as of the debtor, unless from their tenor or from other circumstances it should appear that it was established for the benefit of one or the other."

"8)—*The lower court committed manifest error in weighing the evidence in this case by not concluding that the plaintiffs failed to perform their contract with this defendant and that said nonperformance compelled this defendant to rescind the contract and to consider it ended, thus committing manifest error in not sustaining the counterclaim in this case and granting to this defendant the corresponding damages because of the nonperformance by the plaintiffs.*"

In brief, these errors attack the conclusion of the trial court to the effect that the defendant James B. Gill, "failed to comply with the contract in repudiating the same on the month of March 1952, and failing to purchase from the plaintiffs the ice cream mix which he needed for his business without any reason and notwithstanding the fact that the plaintiffs were willing and eager to supply him with the product", and that "the evidence does not show that the plaintiffs have failed to comply with any obligation to the defendant."

This conclusion is based on the facts which the court found proved and which it stated in its findings 13 to 17. From a careful reading of the transcript of evidence we are convinced that the findings are supported by the evidence. We have not been shown that in settling the conflict in the evidence against the appellant the trial court acted with passion, prejudice or partiality or that it committed manifest error, for which reason, on appeal, we shall not interfere. *Correa* v. *Mario Mercado e Hijos*, 72 P.R.R. 77; *Santiago* v. *Rodríguez*, 72 P.R.R. 253; *Heirs of Muñoz* v. *Cepeda*, 72 P.R.R. 554; *Palmer* v. *Barreras*, 73 P.R.R. 266; *Heirs of Marrero* v. *Santiago*, 74 P.R.R. 763. Therefore, those errors were not committed.

■ In the fourth, fifth, and sixth assignments the appellant contends that the plaintiffs did not introduce sufficient evidence to establish the damages which they actually suffered and their determined or determinable reasonable value, the trial court having fixed them by speculation. He

further contends that the award of damages was not proper, inasmuch as the trial court concluded that on March 5, 1952, prior to the filing of the complaint, the plaintiffs transferred the trade mark "Dairicream" to the corporation Dairicream Inc. but that they never transferred the "Contract" to said corporation.

In upholding these errors the appellant argues that the plaintiffs did not show that they could have supplied the ice cream mix for his establishment during any time whatsoever and for any amount. He bases this statement in that with the exception of the 2,500 pounds of the product sent to him, the other amounts received by the plaintiff Taylor were used in similar establishments which had been opened in Río Piedras and Hato Rey and in which the plaintiffs had a larger investment as owners; and furthermore in that Rutledge himself had notified him in writing that the difficulties in obtaining the preparation and shipment of the product increased each day.

The evidence believed by the trial court showed, however, that these reasons did not make it impossible for the plaintiffs to supply to the defendant the ice cream mix which he needed for his business. The plaintiffs unsuccessfully advised the appellant on repeated occasions to give them advanced notice of his needs of the product in order that they could send him a monthly supply. The evidence also shows that when the plaintiffs were informed that the appellant lacked the product they offered it to him from their stock. We cannot, therefore, agree with appellant in that the plaintiffs failed to prove that they could have complied with the contract had the defendant complied with his part.

In its conclusion of law No. 4, the trial court held that because of defendant's breach of contract "the plaintiffs have failed to receive, from April 1952 until December 1953, 12 cents profit per pound of ice cream mix that the defendant needed for his business and that on the basis of a monthly average of 115 boxes of 25.5 pounds each which defendant

has been buying for his business from the time he acquired it on November 29, 1951, until December 1953, it amounts to the sum of $7,371.00." As to the years 1954, 1955 and until November 1956, date of expiration of the contract, and on which there was no stipulation concerning the amount of ice cream mix that the defendant-appellant would consume in his store, the trial court estimated that it would be 50% less than was stipulated up to the date of the trial. On the basis of this computation it held that the plaintiffs' loss of profits during said period would be of $5,967. The sum of these two amounts constitutes the damages granted in the judgment appealed from.

Appellant argues that the contract did not fix the profits at 12 cents per pound but that it limited the price to an amount not greater than 12 cents added to the cost of the product deposited at the San Juan docks, and that in this way the parties fixed the maximum price that the plaintiffs could charge the defendant but that at any time it certainly could have been less than such maximum price.

Taylor testified that he sold to the defendant and to other clients at the rate of 49–½ cents per pound and that the product cost them 37–½ cents per pound deposited at the San Juan docks. He further stated that it is customary in the United States to charge 30 cents per liquid gallon which is 12 cents per pound; that in that way they determined the price and thus stated it in the contract in order that their clients know what their profit was and that (12 cents per pound) was their profit. On the other hand, defendant himself testified that he bought other brands of ice cream mix at the rate of 57.7, 58 and 60 cents per pound.

In view of this evidence we cannot hold that the trial ourt erred in fixing at 12 cents per pound the profit which plaintiffs failed to receive. Although this profit was on the pier and one of the plaintiffs testified that they incurred traveling expenses, it would not be reasonable to deduct that

expense entirely from the profit which the contract with the defendant would give them since the latter was not the only person to whom the plaintiffs sold ice cream mix. However, there is no evidence in the record that the plaintiffs incurred such traveling expenses during the period which we shall determine must be considered as the basis for computing the profits which they failed to receive. For this reason we shall not persist in the discussion of the error connected with the measure employed by the trial court in order to determine the damages suffered by the plaintiffs.

██ In July 1952, when the defendant had already repudiated the contract in fact as well as by written notice to the plaintiffs, they transferred and assigned the trade mark "Dairicream" to the corporation "Dairicream Inc." [3] The "Contract" however, was not assigned to this corporation or to any other person. Despite such assignment, the trial court determined that the plaintiffs should have also been compensated for the damages (profits which they failed to receive) from the date of the assignment of the trade mark until the date of expiration of the contract. In other words, it determined that the plaintiffs were entitled to all the profits which they would have received under the contract until its expiration, without taking into consideration that they had assigned the trade mark "Dairicream" long before the time of expiration of the contract. The plaintiffs did not prove that despite said assignment they kept the right to use at their will the trade mark assigned with the exclusion of the assignee itself or that the latter was not authorized by the contract of assignment to grant the exclusive use of said trade mark to any person within the area of Martín Peña, thus binding itself to obey the "contract", or something similar. In the absence of that or other evi-

---

[3] The date of this assignment was stipulated by the parties. However, the trial court erroneously concluded that said assignment took place on May 5, 1952.

dence to the same effect, the claim for damages computed on the basis of profits that might have been received from the date of assignment of the trade mark in question is groundless.

It is a well-settled legal doctrine that the mere nonperformance of contractual obligations does not entail compensation for damages pursuant to § 1124 of the Spanish Civil Code, equivalent to § 1077 of our Code (1930 ed.) but that it is essential to *justify their reality* and the direct relation in its case with the fact giving rise to them. Judgments of the Supreme Court of Spain, December 19, 1930; December 22, 1930; June 23, 1925; May 5, 1925; February 2, 1926; November 10, 1907; November 11, 1908; April 25, 1912.

We find no justifiable reason to award damages to the plaintiffs derived from the nonuse and nonpurchase of the "Dairicream" product by the defendant after the date that the former lost all property rights in said trade mark. The plaintiffs have failed to show the existence of damages (loss of profits) after the date of said assignment and its award does not lie.

For the foregoing reasons, the plaintiffs must be compensated in their loss of profits during the months of April, May, June and July, 1952. Pursuant to the stipulation of the parties, the sales average during those months was 115 boxes of ice cream mix of 25.5 pounds each per month.

During those four months the defendant failed to purchase from the plaintiffs 460 boxes containing a total of 11,730 pounds of ice cream mix. Since the profit per pound was 12 cents, the plaintiffs would have received a total benefit of 12 cents multiplied by 11,730 which is equal to $1,407.60. This sum represents the amount of compensation to which they are entitled.

For the foregoing reasons, the judgment appealed from will be modified by reducing the compensation granted to $1,407.60 and as modified it will be affirmed.

Mr. Justice Belaval concurs in the result.